# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:03cv416-C

| | |
|---|---|
| **CLARIANT CORPORATION** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **MEMORANDUM AND ORDER** |
| ) | |
| **RÜTGERS ORGANICS CORPORATION** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**THIS MATTER** is before the Court on cross-motions for summary judgment filed by the parties (Doc. No. 24: Rütgers Motion; Doc. No. 26: Clariant Motion), and related briefs, responses, replies, and appendices. The Court also heard oral argument by the parties on October 26, 2005. Therefore, the motions are ripe for disposition.

I.      BACKGROUND

Procter and Gamble ("P&G") produces the popular laundry detergent "Tide with Bleach." A key ingredient in that product is Nonanoyloxy Benzene Sulfonate ("DNOBS"). In early 2000, P&G sought to replace its existing DNOBS supplier, Eastman Chemical Company ("Eastman"). P&G and Clariant Corporation ("Clariant") signed a five-year agreement on July 13, 2001, for Clariant to begin supplying P&G with DNOBS to be produced at Clariant's Mt. Holly, North Carolina, plant beginning in January 2002.

On the same day, Clariant and Rütgers Organics Corporation ("Rütgers") finalized a five-year Supply Agreement for sodium phenol sulfate ("SPS"), a key raw material in DNOBS. (Doc. No. 28: Clariant Appx. at Attachment 1, Supply Agreement). The parties agree that there was no reason for Clariant to purchase SPS from Rütgers other than the P&G DNOBS project, and that the agreement was intended to mirror the agreement Clariant had with P&G.

Clariant had never made DNOBS before but had made a similar product using the same kind of organic chemistry. Clariant and Rütgers hoped to profit from Clariant's expected ability to produce DNOBS of a quality and in a quantity sufficient to meet the contractual requirements of P&G. That hope was tempered by two provisions in the Supply Agreement at the heart of this dispute. In recognition of the experimental nature of the DNOBS project, the parties allocated business risk through a capital cost recovery provision (Article 25) and a volume shortfall provision (Article 26).

As originally drafted, in light of Rütgers' capital expenses involving the construction of a new plant at its Harrison, Ohio facility, the Supply Agreement's Article 25 provided for a capital recovery payment to Rütgers if Clariant exercised its unilateral right to terminate early. That recovery figure was capped at $2 million. The $2 million figure represented approximately half of Rütgers' capital expenses. The second risk allocation provision dealt with annual sales volume. In Article 26, Clariant agreed to a "shortfall" payment to compensate Rütgers for its variable and fixed costs as well as lost revenue if Clariant's SPS annual purchases fell below a certain annual benchmark. (Doc. No. 28: Clariant Appx. at Attachment 1, Supply Agreement at 14).

Clariant experienced difficulties constructing its Mt. Holly plant and achieving the quality of DNOBS required by P&G. As a result, Clariant missed the January 2002 startup date and was not expected to correct the problems by the end of P&G's contract with Eastman on June 30, 2002. P&G extended its agreement with Eastman for an additional year, and modified its agreement with Clariant on November 30, 2002. (Doc. No. 28: Clariant Appx. at Attachment 10, Amended Agreement). The relationship was extended to ten years and Clariant agreed to pay $22.5 million to compensate P&G for startup delay expenses, including the cost of the obtaining

alternative DNOBS supply between January 1, 2002, and June 30, 2003. (Doc. No. 28: Clariant Appx. at Attachment 10, Amended Agreement at 2).

Clariant's delay also resulted in a shortfall payment of approximately $6 million owed to Rütgers for reduced purchases of SPS. "Heated" negotiations between the parties led them to amend their Supply Agreement on January 10, 2003. (Doc. No. 28: Clariant Appx. at Attachment 2, Amendment to Supply Agreement). The relationship was extended to ten years and Clariant agreed to pay a shortfall penalty of $2.5 million. (Doc. No. 28: Clariant Appx. at Attachment 2, Amendment to Supply Agreement at 1, 3). Additionally, the capital recovery payment section of the agreement was altered. The original Article 25 was re-designated and amended as Article 25.1 providing, in pertinent part:

> In the event that Buyer decides to terminate this Agreement prior to its expiration date *because Buyers's* [sic] *contract with his customer has been terminated* and provided Seller is in compliance with the terms and conditions of this Agreement, Buyer shall compensate Seller for any unrecovered capital investment up to a maximum of US $2 Mio.

(Doc. No. 28: Clariant Appx. at Attachment 2, Amendment to Supply Agreement at 3)(italics highlight new provisions). Article 25.2 was also added to provide, in pertinent part:

> *In the event that Buyer decides to terminate this Agreement prior to its expiration date but the contract with his customer is not terminated and provided Seller is in compliance with the terms and conditions of this Agreement, Buyer shall compensate Seller for any unrecovered capital investment up to a maximum of US $5 Mio.*

(Italics highlight new provisions)(Doc. No. 28: Clariant Appx. at Attachment 2, Amendment to Supply Agreement at 4). The prospective shortfall payment provision remained unchanged, except an updated table specified new figures. (Doc. No. 28: Clariant Appx. at Attachment 2, Amendment to Supply Agreement at 4).

On February 10, 2002, P&G notified Clariant that it was in breach of their agreement by failing to meet quantity and quality requirements. (Doc. No. 28: Clariant Appx. at Attachment 5, letter from Edward M. Sawicki). However, P&G decided not to exercise its right to terminate the agreement at that time and instead signaled its willingness to continue working with Clariant to procure DNOBS while securing alternative supply from Eastman beyond June 30, 2003. (Doc. No. 28: Clariant Appx. at Attachment 5, letter from Edward M. Sawicki). On March 14, 2003, P&G presented Clariant with the $25.8 million cost of obtaining the alternative supply for the following year, if Clariant was unable to begin production. (Doc. No. 28: Clariant Appx. at Attachment 6, letter from S. Van Straelen). In the same letter, P&G gave Clariant the option to "decide to stop the project" by June 15, 2003, and avoid the $25.8 million payment. (Doc. No. 28: Clariant Appx. at Attachment 6, letter from S. Van Straelen). P&G would then convert its one-year contract with Eastman into a long-term supply contract. (Doc. No. 28: Clariant Appx. at Attachment 6, letter from S. Van Straelen).

On June 13, 2003, Clariant admitted that it could not meet the quality requirements of P&G and provided "notice to P&G that Clariant accepts that the opportunity extended by P&G to 'stop the DNOBS project prematurely' has to be triggered." (Doc. No. 28: Clariant Appx. at Attachment 7, letter from Hugh Fowler). Clariant noted it would not owe P&G any further compensation because the notice was given before June 15, 2003. (Doc. No. 28: Clariant Appx. at Attachment 7, letter from Hugh Fowler). On June 18, 2003, P&G responded to Clariant that "P&G is terminating the Agreement and the Amendment pursuant to a request by Clariant on June 14, 2003 and certain rights" in the agreement and correspondence. (Doc. No. 28: Clariant Appx. at Attachment 8, letter from Edward M. Sawicki). Clariant still owed P&G $2 million

4

from the previous startup delay settlement and was prohibited from producing DNOBS at the Mt. Holly plant for five years. (Doc. No. 28: Clariant Appx. at Attachment 8, letter from Edward M. Sawicki).

On June 27, 2003,[1] Clariant notified Rütgers that it was terminating their SPS Supply Agreement. (Doc. No. 28: Clariant Appx. at Attachment 9, letter from Hugh H. Fowler). Clariant stated, "The reason is that Procter & Gamble has informed Clariant that P&G has decided to terminate the DNOBS contract." (Doc. No. 28: Clariant Appx. at Attachment 9, letter from Hugh H. Fowler). Clariant asserted that its termination triggered Article 25.1 of the Amendment to the Supply Agreement ($2 million maximum capital recovery payment) and acknowledged that its annual purchases of SPS would fall below the benchmark. (Doc. No. 28: Clariant Appx. at Attachment 9, letter from Hugh H. Fowler). Clariant invited discussion of "the captial recovery and 2003 shortfall compensation issues." (Doc. No. 28: Clariant Appx. at Attachment 9, letter from Hugh H. Fowler).

In July 2003, Clariant executive Hugh Fowler met with Rütgers executives Frank Boettcher and Thomas Doetsch to discuss payments owed by Clariant to Rütgers. Fowler showed them a copy of P&G's June 18, 2003, termination letter, but he redacted everything except the first paragraph. (Doc. No. 31 Rütgers Appx. at Attachment 2, Fowler at TR 126). The first paragraph simply stated that P&G was terminating its DNOBS purchase agreement with Clariant. (Doc. No. 28: Clariant Appx. at Attachment 8, letter from Edward M. Sawicki). The second paragraph, redacted by Fowler, went on to state that P&G's termination was at Clariant's

---

[1]Although P&G's letter was dated June 18, 2003, the facsimile header indicates that it was not received by Clariant until June 26, 2003. (Doc. No. 28: Clariant Appx. at Attachment 8, letter from Edward M. Sawicki).

5

request. (Doc. No. 28: Clariant Appx. at Attachment 8, letter from Edward M. Sawicki). Following the meeting, Rütgers notified Clariant by letter dated July 28, 2003, that it was seeking the $2 million maximum capital recovery payment in Article 25.1.

During discovery, Rutgers obtained a complete copy of P&G's June 18, 2003, termination letter which indicated that P&G was terminating its contract with Clariant at Clariant's request. Rütgers then amended its Answer and Counterclaim to seek the $5 million maximum capital recovery payment under Article 25.2. (Doc. No. 20, Answer and Amended Counterclaim at 5).

II. SUMMARY JUDGMENT STANDARD

The parties agree that the issues to be resolved on the motions for summary judgment are: (1) which of two capital recovery payments specified in the amended Supply Agreement is owed by Clariant to Rütgers following Clariant's decision to terminate the agreement; and (2) whether Clariant also owes Rütgers a shortfall payment for the year 2003, during which Clariant terminated the agreement. (Doc. No. 24: Rütgers Motion; Doc. No. 26: Clariant Motion). Article 27 of the Supply Agreement specified that Delaware law would control any disputes about the agreement. (Doc. No. 28: Clariant Appx. at Attachment 1, Supply Agreement at 15).

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); accord Dale v. Town of Elsmere, 702 A.2d 1219, 1221 (Del. 1997). The parties agree that there are no genuine

issues of material fact surrounding the events in this case. (Doc. No. 25: Rütgers Mem. at 13; Doc. No. 27: Clariant Mem. at 10). However, they dispute the interpretation of certain provisions of the Supply Agreement and the Amendment to the Supply Agreement.

III. DISCUSSION

The proper construction of a contract is a matter of law. <u>Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.</u>, 616 A.2d 1192, 1195 (Del. 1992). A contract is clear on its face if a court can determine its meaning "without any other guide than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." <u>Id.</u> at 1196 (quoting <u>Holland v. Hannan</u>, 456 A.2d 807, 815 (D.C. Ct. App. 1983))(internal quotations omitted). Thus, "[t]he true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." <u>Id.</u> Therefore, an agreement is not ambiguous simply because parties in litigation differ on its interpretation. <u>Id.</u> Here, the parties agree that the Supply Agreement and Amendment are unambiguous (Doc. No. 25: Rütgers Mem. at 13; Doc. No. 32: Clariant Response at 1), so the Court will not consider parol evidence to interpret the contract or search for the parties' intentions. <u>Pellaton v. Bank of New York</u>, 592 A.2d 473, 478 (Del. 1991).

A. Capital Recovery Payment

As recited in the Supply Agreement, Rütgers was ready to construct a new plant at its Harrison, Ohio, site to meet Clariant's demand for SPS. (Doc. No. 28: Clariant Appx. at Attachment 1, Supply Agreement at 1). The Supply Agreement provided Clariant with the unilateral ability to terminate its contract with Rütgers prior to the expiration of the term. In that event, Article 25 protected Rütgers by providing for a payment of approximately half of its

7

capital investment up to a maximum of $2 million. (Doc. No. 28: Clariant Appx. at Attachment 1, Supply Agreement at 13). After Clariant experienced startup difficulties in its production of DNOBS and shortfalls in its purchases of SPS, the Supply Agreement was amended with new Article 25 terms. Article 25.1 provided that if Clariant "decides to terminate" the agreement early "because" Clariant's contract with P&G has been terminated, Clariant would pay Rütgers a maximum of $2 million for its capital investment. (Doc. No. 28: Clariant Appx. at Attachment 2, Amendment to Supply Agreement at 3). Article 25.2 provided a $5 million maximum payment if Clariant "decides to terminate" the agreement early "but" Clariant's contract with P&G "is not terminated." (Doc. No. 28: Clariant Appx. at Attachment 2, Amendment to Supply Agreement at 3).

Clariant argues that Article 25.1 applies because its contract with P&G had terminated. In oral argument on October 26, counsel stated: "[I]t is totally irrelevant how the agreement was terminated, why it was terminated, and, frankly, by whom it was terminated. None of those are issues that are important to the resolution of this case." (TR at 18). The Court agrees. A reasonable person in the position of the parties would have thought that the $2 million dollar maximum capital recovery applies where Clariant's contract with P&G, the sine qua non for Clariant's contract with Rütgers, was terminated. It makes no difference whether the contract was terminated by P&G or Clariant itself. The act of termination triggered application of Article 25.1 of the Supply Agreement and concomitant capital recovery of $2 million.

The Court believes that Clariant's June 13, 2003, communication to P&G that it would "accept" P&G's offer to "stop" the DNOBS project terminated its contract with P&G. Clariant subsequently gave Rütgers notice of its decision to terminate its Supply Agreement with Rütgers

8

on June 27. That decision to terminate the Supply Agreement given in the wake of Clariant's termination of its contract with P&G triggered the provisions of Article 25.1.

The result would be no different had Clariant's letter to P&G of June 13 constituted a mere invitation to P&G to terminate, as Clariant suggests. Upon receiving P&G's termination on June 26 and then notifying Rütgers on the next day of its decision to terminate, the provisions of Article 25.1 would have taken effect. In either scenario, Clariant decided to terminate its agreement with Rütgers only after its contract with P&G had been terminated.

Rütgers makes much of Clariant's obfuscation concerning P&G's termination at Clariant's request, asking the rhetorical question "What possible reason would Clariant have to lie to Rütgers about what really happened other than to try to bring this situation under 25.1 rather than 25.2 and save itself $3 million?" (Tr. at 50). It's a good point, but not on point. The Court is skeptical about the confidentiality reason offered by Clariant as its explanation for disclosure of the redacted letter and other communications effectively concealing the fact that P&G terminated the contract at the request of Clariant. Maximizing its negotiating position rather than preserving confidentiality was more likely the motivating force. The Court need not resolve that issue. Nor should this sharp practice alter the Court's legal analysis, for it is clear that Article 25.1 was triggered whether or not Clariant resorted to gamesmanship in its conveyance to Rütgers of its decision to terminate.

    B.    Shortfall Payment

Just as Article 25 protected Rütgers from unrecovered capital expenses if Clariant terminated early, Article 26 protected Rütgers from costs associated with manufacturing SPS and lost revenue stream if Clariant failed to order the chemical ingredient at a certain benchmark

quantity. Clariant argues that no shortfall payment was due in 2003 because the quota was an annual, executory obligation that was discharged when Clariant terminated the Supply Agreement. (No. 27: Clariant Mem. at 16). In the alternative, Clariant argues that any shortfall payment should be determined pro rata for the portion of the contract year until termination. (Doc. No. 32: Clariant Response at 11).

Clariant's reliance on Uniform Commercial Code and Delaware Code § 2-106(3)[2] is misplaced. According to those sections, obligations based on future performance on both sides are discharged at termination, but rights based on past performance survive. The shortfall recovery payment established in the Supply Agreement caused the price of previously purchased quantities of SPS to increase if orders for the contract year did not meet the benchmark amount. (Doc. No. 28: Clariant Appx. at Attachment 1, Supply Agreement at 14, 21). Thus, a reasonable person in the parties' positions would have understood the plain language of Article 26 to compensate Rütgers fully for both the costs of producing SPS if Clariant failed to purchase the annual benchmark quantity and for lost revenue during such a contract year. Therefore, the shortfall payment for 2003 survived Clariant's termination of the agreement in that year, but not the agreement's remaining years.

---

[2]Those sections read:
>   Termination" occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On "termination" all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives.

To adopt Clariant's current interpretation of the shortfall provision would create an anomaly. For example, supposing from the beginning of a contract year, April 1,[3] to the end of March, Clariant did not purchase any SPS and then exercised its unilateral right to cancel. Arguing that its executory duties were terminated, Clariant would then owe Rütgers nothing in shortfall payment. In effect, Clariant could time the termination to avoid Rütgers' protection of the shortfall provision. No reasonable party would construe this provision, intended to allocate business risk, in this fashion. Indeed, the Supply Agreement provides for protection for Clariant supposing the flip side of this hypothetical. If Clariant terminated on the second day of the contract year, Article 26.2 requires Rütgers to use its best efforts to mitigate damages within six months' notice.

There is no dispute that Clariant did not purchase the benchmark quantity of SPS in 2003. When Clariant notified Rütgers of its termination, it recognized that its limited purchases triggered a shortfall payment and invited negotiation. (Doc. No. 28: Clariant Appx. at Attachment 9, letter from Hugh H. Fowler). Clariant contends that it simply recognized that shortfall was an issue with Rütgers, and nothing more. The Court disagrees. In 2003, like 2002 before it, Clariant failed to purchase the threshold amount of SPS and is liable for the shortfall subject to Rütgers' duty to mitigate pursuant to Article 26.2 of the Supply Agreement.

C. Damages

1. Capital Recovery Payment

The maximum amount of capital recovery allowed by Article 25.1 is $2 million. The

---

[3]Article 2.4 of the amended Supply Agreement establishes April 1, 2003 as the start up date for the contract year.

parties agree that the calculated figure is $1,944,679. (Doc. No. 28: Clariant Appx. at Attachment 22, Rütgers Answers to First Set of Interrogatories at ¶ 5; Doc. No. 27: Clariant Motion at 16 n.17). Rütgers has requested prejudgment and postjudgment interest on any damages awarded. (Doc. No. 25: Rütgers Mem. at 19).

"In Delaware, prejudgment interest is awarded as a matter of right" and is computed from the date payment is due. Citadel Holding Corp. v. Roven, 603 A.2d 818, 826 (Del. 1992). A party must request such an award in its pleadings, Chrysler Corp. v. Chaplake Holdings, Ltd., 822 A.2d 1024, 1037 (Del. 2003), and the damages must be calculable, that is pecuniary, Rollins Environmental, etc. v. WSMW Industries, 426 A.2d 1363, 1366 (Del. Super. 1980). Here, the capital payment was due on June 27, 2003, the date Clariant terminated its contract with Rütgers. Rütgers requested prejudgment interest in its pretrial disclosures. (Doc. No. 28: Clariant Appx. at Attachment 21, Pretrial Disclosures at 3). The capital cost damages are calculable because the formulas based on the actual amount of SPS purchased are stated in the amended Supply Agreement. Therefore, Rütgers is entitled to prejudgment interest at a rate of 5% over the Federal Reserve Discount Rate on the capital cost portion of its claim for relief. 6 Del. Code § 2301(a).

### 2. Shortfall Payment

The payment required by Article 26 is also driven by a formula based on the amount of SPS sold. However, the formula must be offset by Rütgers' duty to use best efforts to reduce its fixed costs following six months' notice. Clariant's termination letter dated June 27, 2003, will be treated as the six months' written notice required by Article 26.2. Rütgers calculated the shortfall payment to be $5,422,887 (Doc. No. 28: Clariant Appx. at Attachment 22, Rütgers

Answers to First Set of Interrogatories at ¶ 5), but has failed to show the impact on the shortfall calculations of its duty to mitigate which duty has been put in issue by Clariant's Answer to Amended Counterclaim. Therefore, additional pleadings and possibly a hearing are necessary to determine the shortfall damage amount. Because the shortfall damages are calculable, prejudgment interest is awarded. Rollins Environmental, 426 A.2d at 1366 (prejudgment interest appropriate even where pecuniary damages not easily ascertained).

IV.     CONCLUSION

Under the plain language of Article 25.2 of the Amendment to the Supply Agreement, Clariant is subject to a $2 million maximum capital recovery payment because it decided to terminate its agreement with Rütgers prior to its expiration date because its contract with P&G had been terminated. Under the plain language of Article 26 of the Supply Agreement, Clariant owes a shortfall payment because its purchases of SPS in 2003 did not reach the benchmark quantity, and the language of the agreement did not excuse such non-performance in the event of termination.

**IT IS, THEREFORE, ORDERED**:

1.     that Clariant owes to Rütgers $1,944,679 pursuant to the capital recovery provision of Article 25.1 of the amended Supply Agreement, together with prejudgment and postjudgment interest from June 18, 2003, at a rate of 5% over the Federal Reserve Discount Rate;

2.     that Clariant owes to Rütgers shortfall payments pursuant to the formula set forth in Article 26.1 of the amended Supply Agreement less any amount to be determined as a result of Rütgers' duty to mitigate, together with prejudgment and postjudgment interest from June 18,

13

2003, at a rate of 5% over the Federal Reserve Discount Rate;

3. that within 30 days from the entry of this Order, Rütgers shall file with this Court a pleading setting forth its "best efforts to reduce fixed cost" pursuant to Article 26.2 of the amended Supply Agreement, and an estimate of the impact of those efforts on the shortfall payment formula; within 15 days of the filing of Rütgers' pleading, Clariant shall file a response setting forth genuine issues of material fact, if any, with respect to Rütgers' calculations concerning the shortfall calculations; and

4. that a decision on postjudgment interest on the shortfall payment is deferred.

Signed: January 26, 2006

Robert J. Conrad, Jr.
United States District Judge